UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

Case No. 19-20826

v.

HON. DENISE PAGE HOOD

ANTONIO MARQUISE BREWER,

        Defendant.
_____/

**OPINION AND ORDER GRANTING DEFENDANT'S
MOTION TO SUPPRESS EVIDENCE (ECF No. 33)**

**I.    BACKGROUND**

On December 12, 2019, an Indictment was filed charging Defendant Antonio Marquise Brewer with: Distribution of Controlled Substances, 21 U.S.C. § 841(a)(1) (Count One); Felon in Possession of a Firearm, 18 U.S.C. § 922(g)(2) (Count Two); and, Possessing a Firearm in Furtherance of a Drug Trafficking Crime, 18 U.S.C. § 924(c) (Count Three). (ECF No. 12)

This matter is before the Court on Brewer's Motion to Suppress Evidence for Unlawful Search and Seizure. (ECF No. 33) Briefs have been filed and evidentiary hearings held on May 14, 2021 and June 4, 2021.

**II.    EVIDENTIARY HEARING**

When the instant matter occurred, Brewer was on probation with the State of

Michigan. He provided probation with his residence address at 1009 South Francis St., Jackson, Michigan. The Jackson Police Department discovered in March 2019 that Brewer was on Facebook, with an alias "Tony Green." Images and video of Brewer with a handgun were posted on Facebook in February 2019. In connection with investigating Brewer, Detective Brett Stiles and Detective Joseph Merritt conducted a surveillance outside of 905 South Francis on March 8, 2019. While at the scene, the detectives contacted a supervisor with the probation department, Agent Lisa Hendricks, informing her of Brewer's posts and that they believed he was not residing at the 1009 South Francis residence, but instead at the 905 South Francis address with his girlfriend, Presious Reynolds. Brewer's probation officer, Agent Danielle O'Dell, along with Agent Meagan Powell, met Stiles and Merritt at the 905 South Francis address to investigate the matter.

Detective Merritt testified at the evidentiary hearing. He has been a police officer for over 18 years. In March 2019, he was a member of a task force to stop the amount of shootings and to take guns off the streets in Jackson County and placed on a street-level gang interdiction unit. On March 8, 2019, his partner, Detective Stiles, informed him that there was an individual who Detective Stiles believed was in a possession of a firearm who was living on 905 South Francis Street with his girl friend. Detective Stiles showed Detective Merritt a photograph of Brewer holding a

firearm, taken the night before. Detective Stiles understood he was assisting Detective Merritt in investigating Brewer, in collaboration with the circuit court probation to determine if Brewer was staying at the 905 South Francis Street residence contrary to the conditions of his probation. Detective Stiles indicated that they assisted probation officers performing "spot checks" on probationers' residences frequently–from three times nightly or three times a month.

Detective Stiles and Merritt, along with two circuit court probation agents, Agent Danielle O'Dell and Agent Meagan Powell, approached the residence. Merritt's body camera footage of the incident was shown during the hearing. Agent O'Dell knocked on the front door and asked if "Tony" is home. A young man came down the stairs indicating Tony was not home. The young man was Brewer's girlfriend's son. The girlfriend is identified as Reynolds who lived at the 905 South Francis Street home with her children. The footage showed that the detectives and probation agents were in the house. While Merritt was inside the home questioning Reynolds, Brewer was outside on the porch. At some point in time, Brewer was allowed to leave the home.

Agent Powell asks Reynolds if Brewer lives at the house and Reynolds responds that he did not. Reynolds stated that Brewer babysits in the day and sleeps over 4-5 nights a week. Agent Powell told Reynolds that regardless of whether

3

Reynolds consents to the search, probation is going to conduct a search of Brewer's area of control, which is the bedroom. Reynolds expressed reluctance in allowing the search. While probation and Stiles performed the search upstairs in the bedroom, Merritt stayed downstairs.

Stiles later came downstairs notifying Merritt that they had located contraband, some drugs and bullets, where they believed was Brewer's bedroom. Stiles left the home to obtain a search warrant. Merritt questioned Reynolds as to the location of a gun and that Reynolds told him that she knew Brewer had a gun.

Stiles later returned to the home with a search warrant. Merritt assisted at times in the search of the home. The search of Reynolds' bedroom produced clothes that were for a large and portly man. Merritt described Brewer as having a very portly frame. Merritt stated that Reynolds' 18-year old son who lived with her had a separate bedroom and had a very slight frame. Merritt identified other items believed to be Brewer's in the bedroom, including mail, packages, medication and identification with an Adrian Street address in Jackson, Michigan. Methamphetamine, in excess of a kilogram, was also located inside a gym bag belonging to Reynolds. Two guns were also located in a trash can in the second floor bathroom by another officer during the search. The defense stipulated to the list of other items found by the other officers during the search, including crack cocaine, scales, cash and ammunition.

Merritt testified that prior to the search, they had never done surveillance of the South Francis Street area where Reynolds' home was located. He stated that prior to the search, he did not attempt to determine who lived in the home, such as checking the utility, nor checking with the postmaster as to who lived in the home. Merritt further testified that he did not have any information nor any other knowledge of whether Brewer or anyone else lived at the South Francis Street home prior to the day of the search.

Probation Agent O'Dell testified that she has been working for Jackson County Circuit Court since May 2018. Once a probationer is assigned to an agent, an orientation is held, releases for treatments are signed, referrals are made and a home call is scheduled. O'Dell indicated that a probationer's residence is where they live more than 50 percent of the time, but that it was not a written policy. She further indicated that probation agents had discretion as to the meaning of residence. One way to verify a residence is to make home calls, which for new probation agent was done every three months. O'Dell was a new probation agent when Brewer was assigned to her in August 2018.

O'Dell testified that when she first meets with a new probationer, she starts at the beginning of the probation order, goes through the terms of probation, such as whether they would receive adult treatment court. She goes over the fines and costs

and through all the probation conditions, asks them if they have questions, and then has the probationers sign and date the form. O'Dell read into the record section 4.20 of the special conditions which provides that probationers may not use any object as a weapon, must not own, use or have under control or area of control a weapon or any imitation of a weapon, nor be in the company of anyone who possesses weapons. O'Dell also read into the record section 4.24 which stated that probationers must submit to a search of their person, property, including vehicle, residence and computer, without a warrant, if the agent has reasonable cause to believe probationers have items which violate the conditions of the probation.

O'Dell testified that she made a scheduled home call in October 2018 with Brewer at his aunt's home where both his aunt and uncle were home. O'Dell stated that his aunt confirmed Brewer was living there and was sleeping on the couch. O'Dell spoke with Brewer and that was the end of the home call. In January 2019, O'Dell made another scheduled home call with Brewer at his aunt's home. There was no new information about Brewer at that time. O'Dell testified that Brewer reported that he was watching his kids while Presious worked.

O'Dell stated that she had received a phone call from Supervisor Lisa Hendricks who informed her that the Major Crime Task Force received a photo of probationer Brewer with a gun. Hendricks directed O'Dell to go to the residence to

see if she could find Brewer with the gun. O'Dell contacted a detective for the address of the residence and the address was not the same as Brewer's residence on probation's system which belonged to his aunt. The address the detective gave her was a South Francis Street address also, the same street as Brewer's registered residence.

After obtaining the address from the detective, O'Dell left the office to meet the detectives at the South Francis Street address. O'Dell asked Agent Powell to go with her on the unannounced home call. The detectives were already at the South Francis Street residence when O'Dell and Powell arrived. The detectives indicated to the agents that they had been at the residence for awhile and that Brewer was in the residence. O'Dell believed that based the detectives' information, Brewer was at this residence with a gun, which is a violation of the term of his probation.

O'Dell walked up the porch and saw two kids outside. She asked the kids if their mom, dad or Antonio were home, and they responded "yes." O'Dell then asked if they could go inside the home and get their mom. The went inside and hollered for their mom. Reynolds eventually came downstairs and O'Dell asked her if Brewer was upstairs. Brewer eventually came downstairs and stepped outside on the front porch. O'Dell asked Brewer if he had been living at this residence and Brewer denied living there. Brewer told O'Dell that he was staying at his aunt's house, and also at his

7

mother's house. Brewer indicated that he sometimes stayed at Reynolds' house and that he babysat the kids. Both O'Dell and Powell were asking Brewer questions. While talking to the agents, Brewer took a call on his cell phone, where he told the person on the home that "I'm at home." O'Dell recalled that Reynolds had indicated that Brewer slept at her home four to five nights a week.

O'Dell indicated that as a probation agent, it was determined that based on all this information this was Brewer's residence and that probation had the ability to search his area of control. O'Dell stated it was determined that Brewer's area of control was the bedroom he slept in. She testified that probation did not need consent to search Brewer's area of control within the residence where it had been determined that this was his residence. The probation agents asked Reynolds to show them where Brewer was sleeping, and Reynolds accompanied them to the bedroom. When they walked into the bedroom, the probation agents noticed men's belongings and a clothing rack to the right of the bedroom. O'Dell began searching through the men's clothing where she located stacked up soft totes. She searched the totes and found in between the folded clothes ammunition, which were loose, and a magazine clip. O'Dell then asked Reynolds where Brewer kept the gun since O'Dell indicated to her that she found the bullets. Reynolds responded that he either kept the gun in the bedroom, in the clothes, or it was on him. The probation agents did not find a gun in

the bedroom. O'Dell also found an ID on the night stand, some scales, and prescription medicine in Brewer's name. Agent Powell found suspected methamphetamine inside a duffel bag in the closet.

O'Dell testified that the Michigan Department of Corrections does not have a written definition of what a residence is, nor a written policy on the definition of a residence. O'Dell admitted that the idea of a residence as defined by staying at a place more than 50 percent of the time was something she came up with. O'Dell never discussed the 50 percent term with Brewer. Prior to the search, O'Dell admitted that she did not do surveillance on the South Francis Street property, did not attempt to determine who leased the property, did not ask Brewer if he lived at this home. O'Dell indicated that Reynold's home was a short walk away from Brewer's aunt's house, where he resided according to Probation's records and where O'Dell had last visited Brewer. O'Dell admitted that Brewer's terms of probation did not prohibit him from going to Reynold's house and stay there all day and it would not be considered his residence. O'Dell did not recall if she had asked Reynolds if O'Dell slept in the bedroom.

Meagan Powell, an agent with the MDOC Probation, testified that the Jackson County office did not have a policy to determine what a residency was, but that the practice was where someone slept most nights. Powell indicated that to determine

9

someone's actual residency, they would contact that person, usually a field visit to the known residence, to a previously reported residence, or if there is no known residence, to a place where they are suspected to be staying. She testified that some of the questions asked by Probation include where the mail goes, what address is on their driver's license, where do they keep their things and where they sleep the majority of time, which is the most important question. If a probationer reports sleeping at different places, like 20% of time at each place, Powell testified that they would not allow them to have five different residences because there are a lot of conditions involving a probationer's established residence and that they are able to find them right away. She testified that if a probationer is known to have a gun, they are able to search their area of control.

Powell testified that she was asked by Agent O'Dell to go on a home call with her where O'Dell had concerns that Brewer was living at a South Francis Street address instead of his listed address and that Brewer had possession of a gun. Powell indicated that Brewer denied the South Francis Street address was his residence, but that he spent time there to watch his kids and slept in the bedroom. When Powell asked Reynolds how many nights a week Brewer stayed at her home, she responded four to five nights a week. Based on her observations and statements from Brewer and Reynolds, Powell determined that this home was Brewer's primary residence and

10

that they should search the bedroom where he slept in. Powell indicated that Reynold's consent to search the home was not necessary because as a probation agent, she had a duty to search where she believed there were items at the home which violated probation conditions. She then told Reynolds they were gong to search the bedroom where Brewer slept and asked Reynolds to show them where it was.

Reynolds went upstairs to show Powell and O'Dell where the bedroom was and the agents searched the room. Reynolds noted that Brewer's driver's license or ID was on the night stand, with medication and that there were male clothing and shoes in the room. They found bullets and then asked Reynolds where Brewer kept his gun. Reynolds responded that Brewer usually kept in a fabric tote with folded clothes inside. The agents did not find the gun in the tote or anywhere in the bedroom. They found what they believed was methamphetamine, at which time they ceased their search because the agents determined that it moved from a probation search for violations of conditions to a criminal case. Powell left the bag with the suspected methamphetamine for law enforcement to further search. O'Dell informed law enforcement as to the methamphetamine find.

When asked whether the probationers are told that residency is judged on whether they spend more than 50 percent of nights at a certain place, Powell responded that it is not part of a procedure or an orientation. She indicated that she

11

has conversations with her probationers regularly about residency when they are trying to give her more than one residence, or that she thinks they are not being truthful about their residence. On cross examination, Powell indicated that Reynolds never testified that Brewer stayed overnight, only that Brewer stayed at the house four to five time a week and that they slept together, but he doesn't pay the bills at her house. Powell indicated she heard Brewer respond to O'Dell that he watches the kids while Reynolds is at work, but that he lives at his auntie's house down the street. Reynolds works the night shift at her job.

### III. FOURTH AMENDMENT ANALYSIS

Brewer contends that all evidence obtained from the search of Reynolds' home is the fruit of the poisonous tree and any evidence stemming from that search should be suppressed. He claims that his situation did not rise to the level of changing his residence. Brewer asserts that he merely spends a few nights of the week at his girlfriend's house, which should not trigger a probation violation. The Government responds that the search and seizure were proper and that as a probationer, a warrant was not initially required to search the bedroom Brewer was staying at his girlfriend's house.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."

U.S. Const. amend. IV; *see also Minnesota v. Carter*, 525 U.S. 83 (1998). The Fourth Amendment requires a warrant to conduct a governmental search and seizure. *Id.* In order to seek protection under the Fourth Amendment, a defendant must demonstrate that he possessed a legitimate expectation of privacy in the area searched. *United States v. Whitehead,* 415 F.3d 583, 587 (6th Cir.2005). Individuals who wrongfully inhabit a residence do not have a legitimate expectation of privacy in the area. *Id.* Warrantless searches presumptively violate the Fourth Amendment. *Katz v. United States*, 389 U.S. 347, 357 (1967) ("[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.") (footnote omitted).

The Fourth Amendment's warrant requirement does not apply to search of probationers or their residences. *See United States v. Knights,* 534 U.S. 112, 119-21 (2001). A warrantless search of a probationer's home must still be reasonable, however. *Samson v. California*, 547 U.S. 843, 848 (2006). There are two approaches to determine whether a probationer search is reasonable. The first is set forth in *Knights*, a totality-of-the-circumstances test was used to determine whether a warrantless search was reasonable). *Knights*, 534 U.S. at 119-21. The court must weigh legitimate law enforcement or probationary purposes or interest against the

degree of intrusion on an individual's privacy. *Id.* at 119. The second test is found in *Griffin v. Wisconsin*, 483 U.S. 868, 873 (1987), a "special needs" test was used requiring a two-prong inquiry. First, the court must determine whether the probation search provision is reasonable under the Fourth Amendment. Then, if so, the court must determine the search satisfied under the probation search provision. "If a warrantless search is reasonable under either *Knights* or *Griffin*, it need not pass muster under the other." *United States v. Payne*, 588 F. App'x 427, 431 (6th Cir. 2014); *United States v. Damron*, No. 18-3129, 2018 WL 7253960, at *2 (6th Cir. Sept. 10, 2018).

In Michigan, residence and domicile are used interchangeably. In construing the term "reside" in both contracts and statutes, Michigan courts have considered it connotes living somewhere permanently or at least for an extended period of time. *Poe v. Snyder*, 834 F. Supp. 2d 721, 733 (W.D. Mich. 2011)(*citing*, *Home-Owners Ins v Brown*, Docket No. 259233, 2006 WL 2085039 at *2 (Mich. Ct. App. Jul. 27, 2006) and *Curry v. Jackson Circuit Court*, 151 Mich App 754, 758 (1986)).

The Supreme Court's current jurisprudence acknowledges that probationers have a lower expectation of privacy inside their own residents. However, that lower expectation of privacy has not been extended to the homes of third parties. *See United States v. Ped*, 943 F.3d 427, 430 (9th Cir. 2019)(The "diminished expectation of

14

privacy cannot 'justif[y] the entry into and search of a third person's house to search for the parolee.'"). If the Government wishes to search a home based on an allegation that a probationer unlawfully changed their residence, it must establish both "evidence that the defendant was living at some unreported address," and "evidence that the defendant was no longer living at his unreported address." *United States v. Henry*, 429 F.3d 603, 611 (6th Cir. 2005); *Damron*, 2018 WL 7253960 at *4. In *Damron*, the parole officers had information, prior to the search, that the parolee was living at the girlfriend's home because the girlfriend's parents informed the officer that the parolee was living at their daughter's home and that the parolee registered the girlfriend's address with the Sheriff's Office.

Brewer was subject to the Probation Order No. 4 which states that the he must, "[n]otify the probation officer immediately of any change of address or employment status." (ECF No. 50-1, PageID.291) Brewer is also subject to No. 04.24 which states, "You must submit to a search of your person and property, including but not limited to, your vehicle, residence, and computer, without need of a warrant if the field agent has reasonable cause to [] believe you have items which violate the conditions of your probation." Both Agents O'Dell and Powell testified that there are no specific policy or definition of what constitutes a "residence," such as whether the probationer must stay or sleep more than 50 percent per week at a place to be

15

considered the probationer's "residence," nor do they inform probationers during orientation that they must meet the 50 percent per week criteria in order to be considered the probationers' residence during the orientation. Powell testified that she has conversations with her probationers about the 50 percent criteria *after* the probationers inform her they have more than one residence.

In this case, Brewer had not notified Probation of a change of address. The Probation Order does not specifically state that Brewer must stay or sleep at the registered address for a certain number of days or nights. The Probation Order does not specifically require Brewer to inform Probation if he spends the night at a different address for a certain number of days or nights. There is no provision in the Probation Order which provides notice to a probationer that if Probation determines that the probationer sleeps more than 50 percent at another address then Probation can consider the second address as the probationer's residence. There is also no evidence that Agent O'Dell, Brewer's Probation Agent, verbally notified Brewer prior to the search of Reynolds' home, that if he slept or stayed at another home more than 50% of the week, he would be considered a resident at that home and subject to a warrantless search at the second home. Agent O'Dell had notice from Brewer that he watches Reynolds' kids.

Each time Agent O'Dell had made a home visit at Brewer's registered address,

16

he had been at the home. Brewer, at the search of Reynolds' home, indicated to both the Agents and Officers at the scene, that he spent time at Reynolds' home to watch the kids while Reynolds was at work, and that they had a relationship. Brewer further indicated that he lived at his aunt's home, which was down the same street close to Reynolds' home. Reynolds told the Agents and Officers that Brewer does not live at her home and that he does not pay any bills for the home. She admits that he sleeps at her home, four to five times a week. Detective Merritt testified that prior to the search, they had never done surveillance of the South Francis Street address where Reynolds' home was located. There were no attempts to determine who lived at the home. It was only on the day of the surveillance where it was determined that Brewer was at the home, and that is when the detectives contacted the Probation Department who then directed Agent O'Dell to meet the detectives at the scene. Neither the detectives nor the agents determined prior to the search that Brewer no longer lived at his registered address, which was down the same street from Reynolds' home. The evidence shows that Brewer spends time at both Reynolds' home and his aunt's home. The agents and officers allowed Brewer to leave Reynolds' home to go to his aunt's home.

Applying the first prong of the *Griffin* "special needs" test–whether the probation search provision is reasonable under the Fourth Amendment–the Court finds

17

that the Probation Order No. 04.24 provision which Brewer was subject to, is reasonable in that it requires Brewer to submit to a search of his person and property, including his "residence," without need of a warrant if the field agent has reasonable cause to believe that Brewer has which violate the conditions of his probation.

As to the second prong of the test, whether the search satisfied the probation search provision, the Court finds that the Agents' search did not. The evidence the Agents had that Brewer was in possession of a gun was the FaceBook photo the detectives showed the Agents. The detectives did not have evidence that Brewer brought the gun into Reynolds' home. The detectives did not have evidence, other than surveilling Reynolds' home the day of the search, that Brewer lived at Reynolds' home. As admitted by the Probation Agents, there is no policy or written definition as to what constitutes a "residence" under the Probation Order. The Probation Agents do not inform the probationers that if they live or stay at another home more than 50% than that second home is considered their residence. Agent O'Dell, Brewer's probation officer, testified that Brewer was at his aunt's home during her home visits. The subject of a second home was never discussed between Brewer and Agent O'Dell. Brewer had no notice that staying or sleeping at Reynolds' home at a certain percentage, would mean that his residence was now at Reynolds' home, even though he also stayed and slept at his aunt's home.

18

As the Sixth Circuit noted, the Government must establish both "evidence that the defendant was living at some unreported address," and "evidence that the defendant was no longer living at his unreported address" to find that a probationer had a different address other than the reported address. In this case, merely surveilling Brewer at Reynolds' home on the same day as the search, without reviewing any other evidence as to who owned the home, and no determination that Brewer no longer lived at his reported address at his aunt's home down the same street, is insufficient to establish that Brewer's residence was now at Reynolds' home.

The Court finds that the warrantless search of Reynolds' home did not satisfy the two-prong test under *Griffin*. For the same reasons, the search of Reynolds' home also did not satisfy the totality of circumstances test under *Knights*. The detectives investigating Brewer based on a photo of Brewer holding a gun in a car did not have evidence that Brewer brought the gun into Reynolds' home, or that Brewer lived at Reynolds' home, other than observing Brewer at the home on the day of the search. The detectives did not investigate whether Brewer had a different residence from Reynolds' home. The Probation Agents, also did not determine prior to the search that Brewer's residence was no longer at his aunt's who lived down the same street. Brewer indicated he stayed at Reynolds' home to watch the kids and that they had a relationship. The Probation Agents never discussed with Brewer that staying or

19

sleeping at another home more than 50% of the time would mean that the Agents would consider the second home as his residence. The Probation Order does not so state nor is there a policy that this is such.

Based on the above, the Court finds that the evidence found by the Probation Agents on a warrantless search of Reynolds' home must be suppressed. The evidence obtained after a subsequent search from a search warrant, which was based on the evidence found by the Probation Agents on the warrantless search, must also be suppressed as the fruit of the poisonous tree of the first warrantless search.

## IV.   CONCLUSION/ORDER

For the reasons set forth above,

IT IS ORDERED that Defendant Antonio Marquise Brewer's Motion to Suppress Evidence for Unlawful Search and Seizure **(ECF No. 33)** is GRANTED.

IT IS ORDERED that a Status Conference is set in this matter for September 11, 2023, 3:30 p.m.

s/Denise Page Hood<br>
DENISE PAGE HOOD<br>
United States District Judge

DATED: July 31, 2023